**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FRANCOIS OLENGA,

        *Plaintiff*,

  v.

ANDREA M. GACKI *et al*.,

        *Defendants*.

Civil Action No. 19-1135 (RDM)

## MEMORANDUM OPINION

In 2017, the Office of Foreign Assets Control ("OFAC") added Plaintiff François Olenga, a military official in the Democratic Republic of the Congo ("DRC"), to its list of Specially Designated Nationals and Blocked Persons ("SDN" and "SDN List"), pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq*.  This designation froze Olenga's assets subject to U.S. jurisdiction and forbade U.S. individuals or entities from doing business with him.  OFAC designated Olenga on the ground that he directed activities of the Republican Guard, a special security force that former DRC President Joseph Kabila allegedly used to stifle political opposition and undermine democracy.  On July 14, 2018, Congolese state media announced that Olenga had retired from the army and had become the Military Mission Manager for President Kabila—a position that, according to Olenga, does not include authority to direct any military activities.  In part based on that change in circumstances, Olenga requested reconsideration of his designation and, while the administrative process was ongoing, filed this lawsuit.  OFAC granted Olenga's request for delisting but simultaneously re-designated him on the ground that he had both previously undermined and continues to

undermine democracy in the DRC, irrespective of his retirement.  OFAC, in short, gave with one hand, while it took with the other.

Olenga now asks the Court to overturn his re-designation.  He argues that OFAC's decision violates both the due process clause of the Fifth Amendment and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  Olenga contends that his re-designation was procedurally flawed, because the notice he received of the decision was heavily redacted, and substantively flawed, because OFAC acted illogically in granting his request for delisting but then re-designating him based on the same conduct underlying his initial designation.  Pending before the Court are OFAC's motion to dismiss or in the alternative for summary judgment, Dkt. 13, and Olenga's cross-motion for summary judgment, Dkt. 15.

For the following reasons, the Court will **DENY** Olenga's motion for summary judgment, **GRANT** OFAC's motion to dismiss as to Count III, and **GRANT** OFAC's motion for summary judgment as to Counts I, II, and IV.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

From the earliest days of our nation's history, its leaders "have viewed economic sanctions as 'the most likely means of obtaining our objects without war.'"  *Rakhimov v. Gacki*, No. 19-cv-2554, 2020 WL 1911561, at *1 (D.D.C. Apr. 20, 2020) (quoting James Madison, "Political Observations," National Archives (Apr. 20, 1795) (subsequent procedural history omitted).  In 1917, six months after the United States entered World War I, Congress enacted the Trading with the Enemy Act ("TWEA"), 50 U.S.C. app. § 1 *et seq.*, which gave the President broad authority to impose economic sanctions, including comprehensive embargoes, in response to both peacetime emergencies and times of war.  *See Regan v. Wald*, 468 U.S. 222, 225–26

(1984).  Then in 1977, Congress altered the legal framework governing economic sanctions through IEEPA.  The new law "limit[ed] the President's power to act pursuant to [TWEA] solely to times of war," but also permitted the President to declare and respond to national emergencies in times of peace.  *Id.*  at 227–28.

The peacetime powers granted to the President under IEEPA are "essentially the same" as the wartime powers under TWEA, "but the conditions and procedures for their exercise are different."  *Id.* at 228.  Under IEEPA, the President may "declare[] a national emergency" in response to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701.  Once such an emergency is declared,

> the President may, under such regulations as he may prescribe . . . investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B).  These provisions of IEEPA "delegate[] broad authority to the President to act in times of national emergency with respect to property of a foreign country."  *Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981).

In October 2006, pursuant to IEEPA, President Bush issued Executive Order No. 13,413, titled "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo."  Exec. Order No. 13,413, 71 Fed. Reg. 64,105 (2006) ("E.O. 13,413").  The President "determine[d] that the situation in or in relation to the Democratic Republic of the Congo, which has been marked by widespread violence and atrocities that continue to threaten regional stability[,] . . . constitutes an unusual and extraordinary threat to the foreign policy of

the United States."  He therefore "declare[d] a national emergency to deal with that threat."  *Id*.

In July 2014, President Obama amended E.O. 13,413 through Executive Order No. 13,671, titled

"Taking Additional Steps to Address the National Emergency with Respect to the Conflict in the

Democratic Republic of the Congo."  Exec. Order No. 13,671, 79 Fed. Reg. 39,947 (2014)

("E.O. 13,671").  The President imposed sanctions on the specific people listed in the Annex to

the Order as well as on anyone else who met the specified criteria.  *Id*.  As relevant here, E.O.

13,671 amended E.O. 13,413 to cover any person whom the Secretary of the Treasury, in

consultation with the Secretary of State, determines "to be responsible for or complicit in, or to

have engaged in, directly or indirectly" either "actions or policies that threaten the peace,

security, or stability of the Democratic Republic of the Congo" or "actions or policies that

undermine democratic processes or institutions in the Democratic Republic of the Congo."  *Id.*

§ 1(a)(ii)(C)(1) & (2).  The executive order also sanctioned any person determined "to be a

leader of (i) an entity, including any armed group, that has, or whose members have, engaged in

any of the activities described [in the foregoing subsections] or (ii) an entity whose property and

interests in property are blocked pursuant to this order."  *Id.* § 1(a)(ii)(E).  And the executive

order further authorized the Secretary of the Treasury, in consultation with the Secretary of State,

to "take such actions, including the promulgation of rules and regulations, and to employ all

powers granted to the President by IEEPA . . . as may be necessary to carry out the purposes of

this order."  *Id.* § 4.

Pursuant to a redelegation of authority from the Secretary of the Treasury, *see* 31 C.F.R.

§ 547.802, OFAC has promulgated regulations to implement these executive orders, *see*

*generally* 31 C.F.R. pt. 547.  An individual or entity designated by OFAC under E.O. 13,413, as

amended by E.O. 13,671, is placed on the SDN List with the program code "[DRCONGO]."  *See*

Note 1 to 31 C.F.R. § 547.201(a).  The regulations prohibit U.S. people or entities from engaging

in transactions with SDNs.  31 C.F.R. § 547.201.  A blocked person may "seek administrative

reconsideration" of his designation or may "assert that the circumstances resulting in the

designation no longer apply."  *Id.* § 501.807; *see also id.* § 547.101 (incorporating OFAC's

generally applicable administrative reconsideration procedures into the regulations specifically

applicable to the DRC).  As part of the reconsideration process, the blocked person "may submit

arguments or evidence that the person believes establishes that insufficient basis exists for the

designation."  *Id.* § 501.807(a).  The designated person "also may propose remedial steps on the

person's part, such as corporate reorganization, resignation of persons from positions in a

blocked entity, or similar steps, which the person believes would negate the basis for

designation."  *Id.*  And the blocked person may request a meeting with OFAC to discuss his

designation, although such meetings are not required.  *Id.* § 501.807(c).  OFAC reviews the

submitted materials and "may request clarifying, corroborating, or other additional information."

*Id.* § 501.807(b).  At the conclusion of its review of the request for reconsideration, OFAC "will

provide a written decision to the blocked person."  *Id.* § 501.807(d).  As the D.C. Circuit has

observed, a "designated person can request delisting as many times as he likes."  *Zevallos v.

Obama*, 793 F.3d 106, 110 (D.C. Cir. 2015).

## B.    Factual and Procedural Background

On June 1, 2017, OFAC designated Olenga as an SDN, along with the Safari Beach, a

resort that Olenga owned or controlled.  82 Fed. Reg. 26239, 26,239–40 (June 6, 2017).  The

Office determined that Olenga met the criteria for designation as a "leader of an entity that has,

or whose members have, engaged in actions or policies undermining democratic processes or

institutions in the DRC."  Dkt. 13-1 at 14 (citing E.O. 13,671 § 1(a)(ii)(C)(2) & (E)).

Specifically, according to a press release that accompanied Olenga's designation, OFAC determined that in his role as head of the "Maison Militaire," or Military House of the President, Olenga oversaw the Republican Guard, an entity that "has actively disrupted the political process in the DRC, including harassing political rivals, targeting opposing political parties, and arbitrarily arresting and executing Congolese citizens." Dkt. 19 at 17. OFAC asserted that, "[a]s of 2016, Olenga had taken a more active role in leadership of the Republican Guard," including by "develop[ing] a plan to use the Republican Guard to disrupt [political] opposition activities and financial support." *Id.* The press release provided several examples of the alleged Republican Guard activities. *Id.* In April 2016, for instance, "Republican Guard soldiers blocked a team of human rights observers and United Nations security officers from observing an opposition political meeting," and "[s]ecurity forces fired tear gas at opposition members and supporters, preventing the meeting from taking place." *Id.* Then, in September 2016, following "protests across the DRC capital city, Kinshasa, . . . heavily armed Republican Guard members allegedly attacked and set fire to the headquarters of several political parties with cans of gasoline, hand grenades, and rocket-propelled grenades." *Id.* For these reasons, OFAC designated Olenga and blocked his assets.

In a lengthy submission dated June 24, 2017, a lawyer in Brussels, Belgium purporting to represent Olenga requested reconsideration of Olenga's designation. *Id.* at 18–40.[1] On January 10, 2018, OFAC sent Olenga's current counsel a questionnaire seeking additional information

---

[1] Later, after retaining his current counsel, Olenga advised OFAC in a follow-up letter dated October 4, 2017 that "Ferrari Legal P.C. . . . is the sole law firm authorized to provide legal representation on [his] behalf before the agency" and that no other "individual and/or law firm . . . [wa]s . . . authorized" to represent him before OFAC. Dkt. 19 at 41. The original submission was accompanied by a document ostensibly signed by Olenga authorizing the Belgian lawyer to act on his behalf. *Id.* at 38.

relevant to his delisting request.  *Id.* at 42–43.  The questionnaire sought, in particular, English translations of ordinances governing the structure of the DRC's military as well as additional details about Olenga's role within the military hierarchy and his relationship, if any, to the Republican Guard.  *Id.*

On February 13, 2018, Olenga submitted a request for the administrative record underlying his designation.  Dkt. 15-2 at 13.  Arguing that the "[m]ere disclosure of the unclassified administrative record . . . may not be enough to satisfy due process concerns," Olenga requested either access to unclassified summaries of classified material in the record or an opportunity for his cleared counsel to review the full administrative record, including classified material.  *Id.* (internal quotation marks omitted).

On April 10, 2018, Olenga responded to OFAC's questionnaire in a letter that addressed the Office's questions, along with several pages of legal argument.  Dkt. 19 at 44–67.  Olenga acknowledged that, since 2014, he had served as "the Commander of the Military House of the President of the Republic."  *Id.* at 46.  Quoting from DRC ordinances, he explained that his duties in this role included "keep[ing] the President abreast of the military and security situation of the [DRC]," "assist[ing] the President . . . in the design of the political and defense policy of the country," and "the handling of all issues related to the defense and security of the [DRC]." *Id.* (quotation marks omitted).  But Olenga nevertheless maintained that he "ha[d] no relationship with the Military High Command of the Republican Guard or with the Republican Guard."  *Id.* Olenga argued that he "was in no position to command or otherwise advise the Republican Guard as to actions to be taken vis-à-vis the DRC political opposition" and that he "played no role in his capacity as the Commander of the Military House in advising the Republican Guard regarding actions taken in response to protests in Kinshasa in September 2016 or in any other

7

matters." *Id.* at 53.  His submission concluded that because he "d[id] not exercise de facto 'operational control' or any other authority over the Republican Guard," OFAC had an insufficient factual basis to support his designation.  *Id.*

On September 14, 2018, OFAC responded to Olenga's submission with a follow-up questionnaire.  *Id.* at 68–69.  The Office noted that "[a]ccording to news reports, on July 14, 2018, Congolese state media announced a series of promotions and retirements within the Congolese National Armed Forces."  *Id.* at 68.  Those reports indicated that Olenga had "retired from the military as a four-star general" and "had taken a new position as Military Mission Manager of the Head of State."  *Id.*  OFAC asked Olenga to confirm his retirement from the military and to explain in detail his new role, including whether his new position had any authority over "any element of the DRC's security forces."  *Id.*

On October 24, 2018, Olenga responded and confirmed his retirement, providing documentation for his change in roles within the DRC government.  *Id.* at 70–71.  Olenga explained that in his new position as Chargé de Mission, he "serves as a diplomatic liaison between President Kabila and former revolutionaries."  *Id.* at 71.  The new job "d[id] not entail any responsibility or authority with respect to security forces, whether military or civilian."  *Id.* at 72.  Olenga argued that, "[g]iven the change in circumstances arising from [his] retirement," he had met his burden for delisting under OFAC's regulations governing administrative reconsideration.  *Id.* at 74.  As such, he contended that OFAC should rescind his designation "as soon as possible."  *Id.*  On February 13, 2019, unsatisfied with the pace of OFAC's consideration of his request, Olenga sent a follow-up letter reiterating his demand for immediate delisting and threatening to sue in the absence of prompt action.  Dkt. 15-2 at 16.

On April 20, 2019, Olenga filed this lawsuit seeking to force his delisting.  Dkt. 1.  The
allegations in that original complaint are now moot, however, because OFAC granted Olenga's
delisting request on August 15, 2019.  Dkt. 19 at 105.  As explained in a letter to Olenga's
counsel, OFAC "determined that information presented by [Olenga] demonstrates a change in
circumstances that would warrant his removal from the SDN List based on the criteria originally
used."  *Id.*  Because Olenga was no longer a leader of the Republican Guard, he did not qualify
for designation under § 1(a)(ii)(E) of E.O. 13,671, which applies to only the leaders of entities
engaged in prohibited activities.  *Id.* at 6.  But Olenga's victory was short-lived.  At the same
time it delisted Olenga under § 1(a)(ii)(E), OFAC re-designated him under § 1(a)(ii)(C)(2),
which applies to individuals deemed "to be responsible for or complicit in, or to have engaged in,
directly or indirectly . . . actions or policies that undermine democratic processes or institutions
in the Democratic Republic of the Congo."  E.O. 13,671 § 1(a)(ii)(C)(2); *see also* Dkt. 19 at 105.
OFAC updated the Federal Register notice of Olenga's designation, stating only that it was re-
designating Olenga "for being responsible for or complicit in, or having engaged in, directly or
indirectly, actions or policies that undermine democratic processes or institutions in the
Democratic Republic of the Congo."  84 Fed. Reg. 43,259, 43,260 (Aug. 20, 2020).

On September 27, 2019, OFAC provided Olenga with a redacted, unclassified version of
the administrative record for his re-designation.  Dkt. 15-2 at 17.  The record comprises an
evidentiary memorandum that summarizes the Office's case against Olenga, Dkt. 19 at 3–16,
followed by forty supporting exhibits.  Section III of the evidentiary memorandum provides
relevant background and discusses, among other things, the agency's prior listing decision based
on its belief at that time that Olenga "was a leader of the Republican Guard, an entity that has, or

whose members have, engaged in actions or policies that undermine democratic processes or institutions in the DRC." Dkt. 19 at 5.  The memorandum explained:

> As described in OFAC's press release, in 2014, [Olenga] was appointed to serve as the head of the Maison Militaire, or Military House of the President.  The press release further stated that the Maison Militaire oversees the Republican Guard and that in this capacity [Olenga] had operational control over the Republican Guard.  Since early 2016, Republican Guard members had monitored and threatened opposition members and critics of then-President Joseph Kabila.  In his role as the head of the Maison Militaire, [Olenga] oversaw security operations on behalf of then-President Kabila's efforts to suppress political opposition to the DRC.

*Id.*  Section III of the memorandum then explains, as noted above, that OFAC had granted Olenga's request for delisting after Olenga demonstrated that he was "no longer a leader of the Republican Guard."  *Id.* at 6.  But, based on additional evidence, OFAC had re-designated Olenga under a separate provision.  *Id.*

Section IV of the evidentiary memorandum, then, summarizes the basis for the re-designation.  *Id.*  That section contains four subsections, each of which is heavily redacted.  The first, titled "Actions Initiated by Olenga or the Maison Militaire," is redacted in its entirety.  *Id.* The second subsection, titled "While head of the Maison Militaire, [Olenga] controlled the actions of the Republican Guard," includes two unredacted paragraphs.  *Id.* at 7.  Those unredacted passages summarize OFAC's correspondence with Olenga's counsel and note that Olenga was Commander of the Military House of the President of the Republic from September 18, 2014 through July 14, 2018.  *Id.* at 7–8.  The memorandum also quotes a report, the source of which is redacted, for the proposition that as head of the Military House of the President, Olenga "control[led] the elite units and special battalions in the Congolese army, including the powerful yet brutal Republican Guard."  *Id.* at 8 (quotation marks omitted).  The third subsection is titled: "The Republican Guard or its members have engaged in actions or policies that undermine

democratic processes or institutions in the DRC; as Head of Maison Militaire, [Olenga] is

responsible for or complicit in, or has directly or indirectly engaged in, these actions or policies."

*Id.* at 9.  That subpart includes two unredacted paragraphs, both of which summarize articles that

*Human Rights Watch* published in 2016.  Because these paragraphs provide the most extensive

unclassified allegations against Olenga, the Court reproduces them here in their entirety:

> According to a December 16, 2016 *Human Rights Watch* (*HRW*) article, during
> a deadly crackdown of security officials on opposition demonstrations in
> Kinshasa, from September 19 to 21, security forces killed at least 66 protestors.
> Some of those killed burned to death when the Republican Guard attacked
> opposition headquarters.  Security forces took away the bodies of many victims.
> Some were thrown into the Congo River and later found washed up on its shores.
> Regarding the September 2016 protests and aftermath, *HRW* interviewed six
> Congolese security force and intelligence officers who said that members of the
> Republican Guard—including some Republican Guard units deployed in police
> uniforms—were responsible for much of the excessive force used during the
> demonstrations, firing on protestors with live ammunition and attacking at least
> three opposition party headquarters.
>
> . . .
>
> According to a May 9, 2016 *HRW* report, on the morning of April 24, 2016,
> police and Republican Guard soldiers blocked a team of human rights observers
> and security officers from MONUSCO from entering Lubumbashi's Kenya
> commune neighborhood, where a political meeting of the G7 was to take place.
> Police blocked several streets in the neighborhood, forcing opposition leader
> Katumbi to travel on foot rather than by vehicle, and subsequently fired teargas
> toward Katumbi and his supporters, preventing the meeting from taking place.

*Id.* at 10–11.  Finally, the fourth subsection, titled "Other post-designation reporting confirms

that Olenga's removal from the SDN list is not warranted," is also redacted in its entirety.  *Id.* at

11.

Another section of the memorandum, which is also redacted in substantial part,

summarizes "Additional Information Considered by OFAC," including "information that

contradicts some of" the reporting described in the preceding section.  *Id.* at 12.  Yet, despite

these countervailing "reports and correspondence," which apparently included information

provided by Olenga, OFAC "continue[d] to assess based on the totality of the evidence . . . that [Olenga] was responsible for and in control of the Republic Guard" and that, although he had retired, he remained "responsible for or complicit in, or to have engaged in, directly or indirectly, actions or policies that undermine democratic processes or institutions in the DRC." *Id.*

In addition, OFAC provided Olenga with one page of unclassified summaries of the classified materials in the record. *Id.* at 106. The summaries refer to several other instances, mostly from 2016, in which the Republican Guard violently assaulted and suppressed protestors, and they provide additional detail regarding Olenga's role. *Id.* According to these summaries, the Republican Guard "report[ed] to the head of the Maison Militaire, General Francois Olenga," and "General Francois Olenga, Chef de la Maison Militaire, [gave] orders to the Republican Guard on a day to day basis." *Id.* The unclassified summaries also report that in 2017, "the Office of the DRC President instructed Maison Militaire leadership to deploy a group of operatives to identify and entice DRC opposition leaders to abandon their opposition stances in an attempt to weaken the opposition movements," including through bribery. *Id.* With respect to Olenga's activities since his initial designation, OFAC posits that in 2019, after Olenga's retirement from the military, he "supported offensive, violent action against Western diplomats in Kinshasa, DRC." *Id.*

On October 3, 2019, after receiving the administrative record, Olenga filed an amended complaint containing four claims. Dkt. 10. First, Olenga contends that OFAC provided insufficient notice of the reasons for his re-designation, in violation of the due process clause of the Fifth Amendment. *Id.* at 15 (Amd. Compl. ¶ 55). Next, Olenga alleges that OFAC's re-designation decision violates the APA in three distinct ways: (1) OFAC denied him access to the factual basis for his re-designation, in violation of the APA's due process requirements, Dkt. 10

12

at 16 (Amd. Compl. ¶ 60); (2) OFAC unlawfully withheld his removal from the SDN list in

violation of 5 U.S.C. § 706(1), Dkt. 10 at 17 (Amd. Compl. ¶ 64); and (3) OFAC's decision to

re-designate him was arbitrary and capricious in violation of 5 U.S.C. § 706(2), Dkt. 10 at 18

(Amd. Compl. ¶ 67).

In response, OFAC moved to dismiss or, in the alternative, for summary judgment, Dkt.

13, and Olenga, in turn, cross-moved for summary judgment, Dkt. 15.  These motions are now

ripe for decision.

## II.  LEGAL STANDARD

### A.    Motion to Dismiss

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear a

claim and may raise a "facial" or a "factual" challenge to the Court's jurisdiction.  *See Hale v.*

*United States*, No. 13-cv-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).  A facial

challenge to the Court's jurisdiction contests the legal sufficiency of the jurisdictional allegations

contained in the complaint.  *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).

When ruling on a facial challenge, the Court must accept the allegations of the complaint as true

and must construe "the complaint in the light most favorable to the non-moving party."  *Id.*; *see*

*I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  In this

sense, the Court must resolve the motion in a manner similar to a motion to dismiss under Rule

12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir.

2002).

Alternatively, a Rule 12(b)(1) motion may pose a "factual" challenge to the Court's

jurisdiction.  *Erby*, 424 F. Supp. 2d at 182–83.  For factual challenges, the Court "'may not deny

the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and

disputed by the defendant,' but 'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'"  *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  In this context, the factual allegations of the complaint are not entitled to a presumption of validity, and the Court is required to resolve factual disputes between the parties.  *Id.* at 183.  The Court may consider the complaint, any undisputed facts, and "'the [C]ourt's resolution of disputed facts.'"  *Id.* (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

A motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) meanwhile "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (internal citation omitted).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A complaint may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level."  *Id.* at 555–56 (internal quotation marks omitted).  In assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint,

matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

**B.    Summary Judgment**

Summary judgment is appropriate under Rule 56 when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record."  *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012).  In the unique context of a case brought under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Sw. Merck Corp. v. NLRB*, 53 F.3d 1334, 1341 (D.C. Cir. 1995).  In short, it is the role of the administrative agency to "resolve factual issues" and "to arrive at a decision that is supported by the administrative record," while it is the role of the district court "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 18 (D.D.C. 2008).

### III.  ANALYSIS

**A.      Fifth Amendment Due Process Claim**

OFAC argues that Olenga lacks standing to pursue his claim under the Fifth Amendment because, as a non-resident alien who lacks significant contacts with the United States, he is not protected by the due process clause.  Dkt. 13-1 at 23–25.  In the alternative, OFAC argues that, even if Olenga can assert a Fifth Amendment claim, the Office's "well-established" administrative procedures gave him all the process he was due.  *Id.* at 25–32.

Courts in this district have taken divergent approaches to addressing due process claims raised by individuals designated under IEEPA and similar statutes.  Under Supreme Court and D.C. Circuit precedent, "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (citing *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950)).  But in *Jifry*, the D.C. Circuit declined to decide whether the plaintiffs were "entitled to constitutional protections because, even assuming that they [were], they ha[d] received all the process that they [were] due under [circuit] precedent."  370 F.3d at 1183.  Following *Jifry*'s lead, this Court has often declined to decide whether foreign plaintiffs can assert rights under the due process clause where, even assuming they could, the agency had provided the requisite process.  *See, e.g.*, *Fares v. Smith*, 249 F. Supp. 3d 115, 122 (D.D.C. 2017), *aff'd*, 901 F.3d 315 (D.C. Cir. 2018) ("[T]he Court determines that Plaintiffs have received notice and an opportunity to be heard in a manner that comports with due process, and therefore does not reach the antecedent question of whether Plaintiffs are entitled to the protections of the Due Process Clause."); *Joumaa v. Mnuchin*, No. 17-cv-2780, 2019 WL 1559453, at *10 n.13 (D.D.C. Apr. 10, 2019), *aff'd*, 798 F. App'x 667 (D.C. Cir. 2020); *Kadi*, 42 F. Supp. 3d at 28.  Two recent decisions of this Court, however, have

taken the opposite approach, concluding that foreign plaintiffs with no documented ties to the

United States lacked entitlement to the Constitution's procedural protections.  *See Rakhimov*,

2020 WL 1911561, at \*5; *Fulmen Co. v. OFAC*, No. 18-cv-2949, 2020 WL 1536341, at \*5

(D.D.C. Mar. 31, 2020).

OFAC argues that the Court is required to take the latter approach.  It moves to dismiss

Olenga's claims on the theory that his lack of entitlement to constitutional protection undermines

his standing to sue.  Dkt. 13-1 at 25.  Because standing is jurisdictional, OFAC contends that the

Court must resolve this argument before turning to the merits.  *Id.* at n.7; *see also Steel Co. v.

Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The problem for OFAC, however, is that in

*Jifry* the D.C. Circuit held that a court need not address whether plaintiffs are "entitled to

constitutional protections" where, "even assuming that they are, they have received all the

process that they are due under [circuit] precedent."  370 F.3d at 1183.  In taking that approach,

the court was undoubtedly aware of the oft-stated rule that a court cannot assume jurisdiction to

decide the merits of a case.  The strong implication of *Jifry*, then, is that the matter of whether a

foreign plaintiff may claim protection under the due process clause is not jurisdictional, but

rather a merits issue.  *See Joumaa*, 2019 WL 1559453, at \*10 n.13 (concluding that "the question

of whether a foreign plaintiff may bring a Fifth Amendment due process claim is not a

jurisdictional question" because "if it were, the Circuit's approach in *Jifry* would be inconsistent

with the Supreme Court's admonition that a court may not assume jurisdiction for purposes of

resolving the merits of a claim").

In any event, returning to first principles, the Court is satisfied that Olenga has standing

to sue.  To demonstrate standing under Article III, a plaintiff must establish three elements: an

injury-in-fact that is "concrete and particularized" and "actual or imminent;" "a causal

connection between the injury" and "the challenged action of the defendant;" and a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Although OFAC frames its motion to dismiss as an attack on Olenga's standing, the Office's briefing does not address—or even mention—any of those elements. Considering each element, the Court is convinced that Olenga has standing. For the purposes of assessing Olenga's standing, the Court must assume that he will succeed on the merits of his due process claim. *See U.S. House of Reps. v. Mnuchin*, 976 F.3d 1, 4 (D.C. Cir. 2020). That means assuming both that Olenga has sufficient contacts with the United States to entitle him to due process rights and that the notice OFAC provided was deficient. And, with those assumptions in mind, the Court is left with little doubt that the blocking of Olenga's assets using allegedly faulty process constitutes an injury-in-fact, caused by OFAC's re-designation decision, which would be redressable by an order requiring more complete notice. The question of whether Olenga has rights to assert under the due process clause is thus not jurisdictional.

That leaves two questions—whether Olenga is entitled to constitutional due process protections and whether the process he received was adequate—but does not resolve which question the Court should take up first. Either path requires addressing an important constitutional question. *Cf. Al Hela v. Trump*, 972 F.3d 120, 144 (D.C. Cir. 2020) ("Even if we were to assume without deciding that 'procedural' due process . . . applied extraterritorially, the procedural standards are not clearly settled in this specific context."). But here, the Court will follow the D.C. Circuit's example in *Jifry* by assessing whether Olenga received all the process due under the Fifth Amendment, while assuming that the due process clause applies. 370 F.3d at 1183. That approach is more straightforward because, in the context of designations under

18

IEEPA and related statutes, the standards for determining whether an agency has afforded due process are far more developed than those for assessing whether constitutional protections apply.

As noted above, "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." *Jifry*, 370 F.3d at 1182; *see also People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("*People's Mojahedin I*") ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."). But the D.C. Circuit "has not articulated a specific test for determining whether a foreign national residing outside the United States maintains the requisite 'substantial connections,'" *Rakhimov*, 2020 WL 1911561, at *5 (quoting *Jifry*, 370 F.3d at 1182), and, instead, has engaged in fact-dependent, case-by-case assessment, *compare Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001) (holding that two Iranian groups had sufficient contacts because of a physical presence in the National Press Building and an interest in a small bank account), *with 32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (finding insufficient contacts where a group's members had post office boxes and a bank account in the United States). "Nor has the D.C. Circuit addressed whether such rights turn on the presence of property in the United States, or whether [a plaintiff] can raise certain constitutional claims, but not others." *Kadi*, 42 F. Supp. 3d at 25. The exact standard that the Court would apply in deciding whether Olenga may assert due process claims is thus unsettled.

The extent of Olenga's contacts with the United States, moreover, is unclear from the record. The complaint alleges only that "all of Olenga's property and interests in property within U.S. jurisdiction were blocked," Dkt. 10 at 5–6 (Amd. Compl. ¶ 15), without any explanation of what, if anything, his property and interests in property might be. OFAC argues that "this

allegation does not indicate that Olenga in fact has property within the United States" and "is merely a description of the legal consequence of his re-designation."  Dkt. 13-1 at 24.  Olenga responds by reiterating that "Olenga is a foreign national currently resident in the DRC and that his property and interests in property within U.S. jurisdiction were blocked as a result of [OFAC's] actions," while denying OFAC's contention that he had acknowledged a lack of physical presence in the United States.  Dkt. 15-2 at 32.  Olenga's failure to plead in greater detail his connections to the United States could on its own provide grounds for ruling in OFAC's favor.  But given the lack of clarity surrounding both the law and facts necessary to decide whether Olenga is entitled to constitutional protections, the sounder course is to first address whether OFAC provided sufficient process, even assuming he is so entitled.

Turning to that question, Olenga contends that the process by which OFAC granted his request for reconsideration but nevertheless re-designated him is unintelligible; the Office has "precluded Olenga from understanding the reasons for his re-designation and from meaningfully contesting that re-designation."  Dkt. 15-2 at 30.  Olenga contends that he received insufficient notice of the reasons for his re-designation because of the substantial redactions in the unclassified administrative record.  *Id.* at 24.  Focusing on Section IV of the evidentiary memorandum, which provides the "Basis for Determination," Olenga emphasizes that most of the paragraphs were redacted, including two subsections in their entirety.  *Id.* at 24–26 (quotation marks omitted).  Under the first subsection of Section IV, which covers "Actions Initiated by Olenga or the Maison Militaire," OFAC completely redacted all four supporting paragraphs.  *Id.* at 24 (quotation marks omitted).  Those redactions alone, Olenga contends, demonstrate that he "clearly lacks notice as to OFAC's findings regarding actions purportedly undertaken by him or the Maison Militaire that undermine the DRC's democratic processes or institutions."  *Id.* at 25.

As Olenga points out, OFAC also redacted six of the eight paragraphs in the second subsection, eight of ten paragraphs in the third subsection, and the fourth subsection in its entirety.  Olenga argues that, taken together, "[t]he disclosed record provides no actual notice as to the reasons for his designation and thus no meaningful opportunity for him to rebut the findings made by the agency in support of its determination."  *Id.* at 26.

Olenga also takes issue with OFAC's unclassified summaries, "most of which are single-sentenced and broadly repetitive of each other" and which "relate information of unclear relevance to the basis for Olenga's re-designation."  *Id.*  Olenga faults OFAC for listing these summaries in random order without cross-referencing them with Section IV of the evidentiary memorandum or with the relevant exhibit numbers, such that it is impossible to tell whether or how these allegations form the basis for Olenga's re-designation.  *Id.* at 27 ("[A]bsent notice of the uses to which OFAC is marshalling its allegations, Olenga is placed at a particular disadvantage in challenging them . . . ."); *see also id.* at 27–28 ("[Olenga] must know not just the findings themselves but also the ways in which OFAC reasons from its findings to support its conclusions," because "OFAC's reasoning is as susceptible to legal challenge [under the APA] as are its findings themselves.").  Likewise, Olenga asserts that he is left to guess whether the unclassified summaries represent all of the findings underlying his designation or only a portion of them, with certain classified allegations possibly remaining entirely undisclosed.  *Id.* at 28.

In considering "whether OFAC's designation of a plaintiff provides constitutionally adequate notice," thereby "enabling him meaningfully to avail himself of his opportunity to be heard," the Court must "weigh three factors under the familiar *Mathews v. Eldridge* balancing test."  *Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  The Court must consider (1) "the private interest that will be affected by the

official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.  This is a flexible standard, and "[t]he due process clause requires only that process which is due under the circumstances of the case." *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) ("*People's Mojahedin II*").  "'[T]he fundamental requirement of due process,'" however, "is 'the opportunity to be heard at a meaningful time and in a meaningful manner.'"  *Id.* at 1241 (quoting *Mathews*, 424 U.S. at 333).

The D.C. Circuit considered and squarely rejected a due process argument much like Olenga's in *Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 163–64 (D.C. Cir. 2003).  In that case, like in this one, OFAC designated the plaintiff organization under IEEPA, based on a presidentially declared national emergency, then re-designated the plaintiff once the litigation had begun, after requesting additional information from the plaintiff. *Id.*  There, as here, the plaintiff argued that, by relying in part on undisclosed classified information, OFAC had provided constitutionally deficient notice of the reasons for the designation.  The D.C. Circuit was unpersuaded.  As the court noted, IEEPA specifically provides that if a designation is "based on classified information" then "such information may be submitted to the reviewing court *ex parte* and *in camera*."  50 U.S.C. § 1702(c).  And the court explained without qualification that notice to the designated party "need not disclose the classified information to be presented *in camera* and *ex parte* to the court under the statute." *Holy Land*, 333 F.3d at 164.  Rather, "due process require[s] the disclosure of *only* the unclassified portions of the administrative record."  *Id.* (quotation marks omitted).  The D.C.

Circuit emphasized "the primacy of the Executive in controlling and exercising responsibility over access to classified information, and the Executive's compelling interest in withholding national security information from unauthorized persons in the course of executive business." *Id.* (internal quotation marks and citations omitted).  Applying these principles, the *Holy Land* court concluded that the plaintiff's designation "based upon classified information to which it has not had access" comported with due process.  *Id.*

*Holy Land* is binding precedent, and its implications for Olenga's due process argument are unambiguous.  OFAC has disclosed the unclassified portions of the administrative record and unclassified summaries of the classified information, while submitting the classified portions for the Court's *ex parte* and *in camera* review.[2]  The public record materials provided Olenga with sufficient notice of OFAC's reasons for re-designating him to allow for a meaningful opportunity to be heard.  Under *Holy Land*, that is all—and, indeed, more than—IEEPA and the Constitution require.

Olenga contends that a more recent decision from the D.C. Circuit takes a more generous view of the notice required when OFAC makes a designation based in part on classified information.  *See Fares*, 901 F.3d at 323–24.  In *Fares*, the court considered OFAC's designation of two Panamanian men and their business under the Foreign Narcotics Kingpin Designation Act.  *Id.* at 317.  Applying the *Mathews* three-part framework, the D.C. Circuit stressed that "the effect of an OFAC designation on the designee's private interests is dire" and that, "[w]hen the government freezes assets based on redacted evidence—thereby limiting the designee's

---

[2]  It is unclear, at least from the public record, whether all the portions of the administrative record that OFAC has redacted are in fact classified, or whether some of the redacted material is "law-enforcement sensitive" but not classified.  Because neither party seeks to draw any legal distinction between classified and law-enforcement sensitive information, the Court will treat all the redacted material as though it were classified.  *See Fares*, 901 F.3d at 324–25.

opportunity to probe or cross-examine on that evidence—the risk of erroneous deprivation is especially high." *Id.* at 323–24 (internal quotation marks omitted). But the *Fares* decision also recognized that the third *Mathews* factor—"the governmental interest at stake"—is dispositive "in the extraordinary circumstance[] where the government's withholding is justified by 'the privilege and prerogative of the executive' in protecting vital national security interests." *Id.* at 324 (quoting *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208 (D.C. Cir. 2001) ("*NCORI*")). As the *Fares* court further explained:

> Forcing the executive branch to disclose information that it has validly classified would "compel a breach of the security which that branch is charged to protect." *NCORI*, 251 F.3d at 208–09; *see Holy Land*, 333 F.3d at 164; *People's Mojahedin II*, 327 F.3d at 1242; *see also Jifry*[, 370 F.3d at 1183]. We have "already decided . . . that due process required the disclosure of *only* the unclassified portions of the administrative record." *People's Mojahedin II*, 327 F.3d at 1242. As the Ninth Circuit explained, "[g]iven the extreme importance of maintaining national security, we cannot accept [plaintiff]'s sweeping argument—that OFAC is not entitled to use classified information in making its designation determination." *Al Haramain* [*Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 980–81 (9th Cir. 2012)] (collecting cases). As a consequence, in certain limited circumstances, in lieu of classified evidence the government may provide designees with sufficiently specific "unclassified summaries . . . ensuring that neither the [government]'s sources nor national security were compromised, . . . [that] provided [plaintiffs] with the 'who,' 'what,' 'when' and 'where' of the allegations." *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001); *see Al Haramain*, 686 F.3d at 982–83.

*Id.* In short, where an OFAC determination is supported by classified information, the D.C. Circuit has "authorized" use of an alternative process of judicial review that provides the designee with notice and an opportunity to be heard but permits OFAC to submit the classified material to the court *ex parte* and *in camera*. *Id.*

Here, Olenga does not challenge OFAC's treatment of the withheld information as classified—and the Court's review of the *ex parte* submission confirms that Olenga would have no basis to do so. As for notice, the unclassified portions of the administrative record and the

unclassified summaries of classified materials provide the who, what, when, and where of the allegations, as contemplated by *Fares*.  Olenga is correct that the unclassified summaries are listed in seemingly random order, but they are relatively detailed, providing dates and locations for many of the allegations.  Dkt. 19 at 106.  And contrary to Olenga's assertions, the connections between the summaries and the allegations in the evidentiary memorandum are readily apparent, even without access to the classified material.  In addition to those summaries and the unredacted portions of the administrative record, moreover, OFAC also sent Olenga two sets of questions about his role within the DRC military, which gave him additional notice of what information OFAC considered important in reconsidering Olenga's initial designation.  *Id.* at 42–43, 68–69.

Olenga is, of course, "at somewhat of a disadvantage in being unable to review the whole administrative record, in particular the classified record."  *Kadi*, 42 F. Supp. 3d at 23.  But given the overriding governmental interest at stake in protecting classified information and the wide berth afforded the executive branch in matters relating to foreign affairs and national security, the Court concludes that OFAC has provided Olenga with sufficient notice of the reasons for his designation to comply with the due process clause of the Fifth Amendment.

The Court will therefore grant summary judgment in favor of OFAC on Count I.

**B.**     **APA Claims**

Olenga brings three claims under the APA.  The Court considers each in turn.  Only the third presents a substantial question.

1.     *APA Due Process Claim*

Olenga first alleges that "[b]ecause [he] has been denied access to the factual basis for his designation, [OFAC has] failed to provide him with adequate notice and ha[s] thus violated his

due process rights under the APA."  Dkt. 10 at 16 (Amd. Compl. ¶ 60).  The exact nature of this claim is not entirely clear.  The APA directs a reviewing court to "hold unlawful and set aside agency actions" that it finds to be "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(C).  But the Court has already rejected Plaintiff's constitutional due process claim and filtering that same argument through the APA does nothing to save it.

In his motion for summary judgment, Olenga frames this claim in two other ways.  First, he argues that his re-designation was arbitrary and capricious because OFAC failed entirely to set forth its reasons for that decision.  Dkt. 15-2 at 34–35.  Insofar as this argument substantively challenges OFAC's decision as unreasonable, it is a facsimile of Olenga's final claim, which the Court considers below.  If, instead, Olenga intends to argue that the re-designation is procedurally invalid because it was not based on any administrative record whatsoever, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), that argument is a nonstarter.  The administrative record is heavily redacted, but it exists and sets forth the agency's reasoning for Olenga's re-designation.  Olenga cannot force OFAC to reveal classified information under the APA any more than he can under the Constitution.

Alternately, Olenga contends that OFAC violated the APA's requirement that an agency's denial of a party's application or petition be accompanied by a "a brief statement of the grounds for denial."  5 U.S.C. § 555(e).  As an initial matter, it is not clear that this provision, which governs agency *denials*, is applicable here, where the agency *granted* Olenga's request for reconsideration, while at the same time re-designating him under a separate provision of E.O. 13,413, as amended.  *See Rakhimov*, 2020 WL 1911561, at *7.  But, even if § 555(e) applies, "[t]his notice requirement is not onerous."  *Sulemane v. Mnuchin*, No. 16-cv-1822, 2019 WL 77428, at *7 (D.D.C. Jan. 2, 2019); *see also Roelofs v. Sec'y of the Air Force*, 628 F.2d 594, 601

(D.C. Cir. 1980) ("[I]t probably does not add to, and may even diminish, the burden put on an agency by the APA's provision for judicial review.").  "At its core, this requirement simply forces the agency to explain why it chose to do what it did."  *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 242 (D.D.C. 2012) (internal quotation marks and citation omitted).  Here, as in *Sulemane*, "OFAC provided . . . much more than the 'brief statement' of its grounds that the statute requires."  *Sulemane*, 2019 WL 77428, at *7.  The unredacted portions of the evidentiary memorandum and the unclassified summaries of the classified portions of the record together provide sufficient information to clear the low bar of 5 U.S.C. § 555(e).

The Court will therefore grant summary judgment to OFAC on Count II.

2.      *Agency Action Unlawfully Withheld*

Olenga next maintains that OFAC has "unlawfully withheld the rescission of [his] designation and the removal of [his] name from the SDN List" in violation of 5 U.S.C. § 706(1).  Dkt. 10 at 17 (Amd. Compl. ¶ 64).  This argument misapprehends the nature of that provision of the APA.  Under 5 U.S.C. § 706(1), a Court must "compel agency action unlawfully withheld or unreasonably delayed."  As the Supreme Court has explained, this provision applies only when "an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  The agency must have "a ministerial or non-discretionary duty amounting to a specific, unequivocal command."  *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  Here, OFAC acted on Olenga's request for reconsideration.  Olenga just disagrees with the Office's decision.  A plaintiff who does not like an agency's action cannot use § 706(1) to compel the agency to take the opposite action.  Because the agency has adjudicated Olenga's request, his claim under § 706(1) is, at best, moot.

27

The Court will therefore grant OFAC's motion to dismiss with respect to Count III.

3.      *Arbitrary and Capricious Agency Action*

Finally, Olenga alleges that OFAC's decision to re-designate him is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(C).  Dkt. 10 at 17–18 (Amd. Compl. ¶ 65–67).  The APA requires "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  The Court must, accordingly, assess whether the agency considered "the relevant factors and whether there has been a clear error of judgment."  *Id.* at 43 (quotation marks omitted); *see also Judulang v. Holder*, 565 U.S. 42, 53 (2011).  "The scope of review under the 'arbitrary and capricious' standard," however, "is narrow," and the Court must not "substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Rather, the Court must "presume[] the validity of agency action."  *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003).  All that the APA requires is that "the process by which [an agency] reaches [its] result [is] logical and rational."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  An agency's decision, moreover, need not be "a model of analytic precision to survive a challenge," and "[a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *Bowman Transp., Inc. v. Arkansas–Best Motor Freight Sys.*, 419 U.S. 281, 286 (1974)).  The Court must uphold OFAC's action so long as it "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quotation marks and citation omitted).

The Court's review is even more deferential where matters of foreign policy and national security are concerned.  The D.C. Circuit has shown "extreme" deference to blocking orders,

which fall "at the intersection of national security, foreign policy, and administrative law."

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see also Zarmach*

*Oil Servs. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe

a substantial measure of deference to the political branches in matters of foreign policy,

including cases involving blocking orders." (internal quotation marks and citation omitted)).

Applying this highly deferential standard, the Court is satisfied that OFAC's decision to

re-designate Olenga was neither arbitrary nor capricious.  Even based on the unclassified

administrative record alone, OFAC considered substantial information suggesting that "Olenga is

responsible for or complicit in, or has engaged in, directly or indirectly, actions or policies that

undermine democratic processes or institutions in the DRC."  Dkt. 19 at 6.  According to the

unclassified summaries of the classified portions of the administrative record, Olenga acted both

before and after his initial designation to undermine democracy in the DRC.  In 2016, for

instance, Olenga allegedly "plan[ned]" to deploy "teams that could travel throughout the DRC to

prevent opposition protests, especially those organized by the G7."  *Id.* at 106.  Those "teams

would infiltrate demonstrations to identify protest leaders, report opposition plans to Republican

Guard leadership, and attempt to prevent the opposition leaders from gathering support."  *Id*.

And in 2019, after Olenga's initial designation, he allegedly "supported offensive, violent action

against Western diplomats in Kinshasa, DRC."  *Id*.  OFAC further concluded that, before his

retirement, "Olenga gave orders to the Republican Guard on a day to day basis" and that "the

Republican Guard regularly arrested protestors and assaulted them while in Republic Guard

custody;" "used a variety of weapons to beat protestors;" "fired into crowds of protestors in

Lubumbashi, killing two civilians;" and, while dressed in uniforms of the Congolese National

Police, "used live ammunition in combating protestors."  *Id*.

To be sure, OFAC's failure to identify the sources of this information makes it more difficult for Olenga to respond.  But, under settled law, OFAC is entitled to withhold classified information, the disclosure of which could threaten national security or foreign relations, and, in any event, some of the most troubling allegations against Olenga come in two publicly available reports from *Human Rights Watch*, of which Olenga has had full notice.  *Id.* at 10–11.  One of those reports details a "deadly crackdown" in which "security forces killed at least 66 protestors," some of whom "burned to death when the Republican Guard attacked opposition headquarters."  *Id.* at 10.  The Court concludes that OFAC acted rationally in re-designating Olenga.

Olenga nonetheless argues that OFAC's reasoning was flawed in three ways.  First, he contends that because he has retired as head of the Maison Militaire, he is "not engaged in any ongoing conduct that supports his re-designation."  Dkt. 15-2 at 39–40.  According to Olenga, the text of E.O. 13,413, as amended, does not permit OFAC to designate someone for past conduct (or at least not for the type of past conduct alleged in this case).  *Id.* at 42–43.  And, even if it did, Olenga suggests that his re-designation for past conduct is inconsistent with OFAC's policies and regulations.  *Id.* at 41–42.  The Court is unpersuaded.

As an initial matter, Olenga is factually incorrect.  As the unclassified summaries disclose, OFAC's decision to re-designate him was based, in part, on his support, in 2019, for "offensive, violent action against Western diplomats."  Dkt. 19 at 106.  That recent conduct is at odds with Olenga's argument that his re-designation was based on only past acts.  But even on their own terms, his arguments fail.  The provision of E.O. 13,671 under which he was designated applies to individuals deemed "to be responsible for or complicit in, or to *have engaged in*, directly or indirectly . . . actions or policies that undermine democratic processes or

institutions in the Democratic Republic of the Congo."  E.O. 13,671 § 1(a)(ii)(C)(2) (emphasis added).  Olenga argues that this language allows OFAC only "to designate persons who are engaged in ongoing conduct or have recently been engaged in ongoing conduct that undermines democratic processes or institutions in the DRC."[3]  Dkt. 15-2 at 42.  The Court detects no such limitation in the text.  Someone can be found "to have engaged in, directly or indirectly" an action they took in the past.  As a fallback textual argument, Olenga also posits that only the phrase "engaged in" is in past tense, while "to be responsible for or complicit in" are in present tense, such that someone can be designated for past conduct only where he "engaged" in that conduct himself.  Dkt. 15-2 at 42–43.  Here, because OFAC contends that he was, at worst, responsible for the Republican Guard but did not himself engage in their activities, Olenga reasons, he does not fit the criteria.  *Id.* at 43.  The problem with this argument is that the Executive Order refers to activities that the blocked individual "engaged in . . . directly or *indirectly*."  E.O. 13,671 § 1(a)(ii)(C)(2) (emphasis added).  And if Olenga was responsible for or complicit in the Republican Guard's actions, he at least engaged in those same actions indirectly.  Nothing in the text of the Executive Order prevented OFAC from re-designating Olenga based on his past conduct.

Nor do OFAC's policies or regulations stand in the way of Olenga's re-designation.  With respect to policy, as OFAC acknowledges, "'[t]he ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior.'"  Dkt. 16 at 30 (quoting OFAC Resource Center, Filing a Petition for Removal from an OFAC List (last updated May 2, 2017),

---

[3]  As a threshold matter, the Court is uncertain whether OFAC's actions are reviewable under the APA for compliance with the text of E.O. 13,413, as amended by E.O. 13,671.  But OFAC and Olenga seem to agree that the Executive Orders are binding on the Office and that the Court may police OFAC's compliance with those orders.  Based on that concession, the Court will consider whether OFAC has followed the President's directives.

https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/petitions.aspx).  Olenga's
alleged conduct in 2019, however, undermines any representations he might make of a positive
change in behavior.  But, even putting that basis for OFAC's action aside, the President has
broad authority under IEEPA and could reasonably conclude that the deterrence of international
bad actors, at least at times, requires the imposition of sanctions on those who have retired or
moved on to other pursuits.  Such a determination is precisely the type of judgment that is
properly left to the President and his advisors and falls outside the judicial ken.  And, if Olenga
has truly made a positive change in his behavior that merits relief, he can submit evidence of his
good deeds to OFAC in another request for reconsideration.  As for OFAC's regulations, they
permit motions for reconsideration "assert[ing] that the circumstances resulting in the
designation no longer apply," which would seem to contemplate that a change in circumstances
is grounds for the withdrawal of a designation.  31 C.F.R. § 501.807.  OFAC complied with its
procedures by recognizing the change in Olenga's circumstances and granting his request for
reconsideration on that basis.  But the Office also found it appropriate to re-designate him under
a different authority, and nothing in the regulations prevented it from doing so.

Second, Olenga argues that his re-designation was a "sham" designed "solely for the
purpose of evading judicial review" because the re-designation rested "on virtually the same
exact factual basis upon which [OFAC] based its initial designation of Olenga."  Dkt. 15-2 at 8,
43–44.  This argument is mistaken for several reasons.  Again, as an initial matter, it is factually
inaccurate, in part, because the re-designation was based not only on historical conduct but also
on Olenga's alleged actions in 2019.  Dkt. 19 at 106.  Moreover, the D.C. Circuit explicitly
affirmed OFAC's ability to re-designate someone based in part on the same evidence that
supported the initial designation in *Holy Land*, 333 F.3d at 162.  There is nothing illogical or

improper about OFAC re-designating Olenga under a different provision of the executive order, as amended, now that the provision under which he was initially designated no longer applies.

Third, and finally, Olenga contends that OFAC failed to consider adequately the exculpatory evidence that he presented during the administrative process, particularly concerning his lack of control or authority over the Republican Guard.  Dkt. 15-2 at 47–48.  As explained in the evidentiary memorandum, OFAC considered "information that contradicts . . . reporting and related assessments regarding Olenga's roles and responsibilities over the Republican Guard while head of the Maison Militaire."  Dkt. 19 at 12.  But despite that exculpatory information, "OFAC continue[d] to assess based on the totality of the evidence . . . that Olenga was responsible for and in control of the Republican Guard."  *Id.*  In its unclassified summaries of classified materials, OFAC refers to two reports indicating that Olenga gave orders to the Republican Guard on a day-to-day basis.  *Id.* at 106.  OFAC also summarizes an analysis concluding that, "[a]lthough the [Republican Guard] is technically a unit of the [DRC military], by law it is under operational control of the Presidency," which "essentially means that it reports to the head of the Maison Militaire, General François Olenga."  *Id.*  Because OFAC does not— and could not—reveal the sources of its information on the public record, its rationale for deciding that the incriminating evidence outweighs the exculpatory evidence is opaque.  But the record makes clear that the Office considered the competing facts, and the Court must defer to OFAC's resolution of which pieces of evidence were most credible and convincing.  *See Zevallos*, 793 F.3d at 114 ("[W]e agree that much of this evidence could be viewed in a light more beneficial to [the plaintiff].  However, when we evaluate agency action, we do not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision." (internal quotation marks and citation omitted)).

Beyond the reasons given above, the Court concludes that the classified administrative record, which OFAC lodged with the Court for *ex parte* and *in camera* review, supports OFAC's determination.  *See* 50 U.S.C. § 1702(c).  The Court will therefore grant summary judgment to OFAC on Olenga's claim in Count IV of his amended complaint.

## CONCLUSION

Accordingly, the Court will **DENY** Olenga's motion for summary judgment and will **GRANT** OFAC's motion to dismiss Count III and for summary judgment as to Counts I, II, and IV.

A separate order consistent with this Memorandum Opinion will issue.


<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  November 30, 2020